Zoldoske vs. The State.

ZOLDOSKE, Plaintiff in error, vs. THE STATE, Defendant in error.

*May 28 — June 15, 1892.*

CRIMINAL LAW AND PRACTICE: MURDER BY POISONING. (1) *Proof of* corpus delicti. (2) *Evidence of previous poisoning.* (3–6) *Instructions to jury.* (7) *Exclusion of witnesses from court room.* (8–11) *Expert testimony.* (12) *Immaterial error.* (13) *New trial: Right to have motion heard: Statement by judge for publication.*

1. Upon a trial for murder by strychnine poisoning it is not essential that possession of strychnine by the defendant be shown by direct evidence. It is enough if it be shown that such poison was in the house in which the defendant lived, within her easy and immediate reach, and that she knew of it.

2. The fact that a member of the family in which the defendant lived had died from strychnine poisoning previous to the poisoning in question, might properly be considered by the jury in determining whether the poisoning in question was accidental or not.

3. It was not error for the court, in charging the jury, to submit to them the question whether the death in question was natural or was caused by strychnine poisoning, the jury not being misled thereby to suppose that such question was submitted as decisive of the whole case.

4. Nor was it error to present to the jury, separately and in their order, the questions whether the deceased committed suicide and whether her death was the result of accidental poisoning.

Zoldoske vs. The State.

5. It was not error for the court, in charging the jury, to state in general terms the claims of the prosecution as to the circumstances of the death, although he did not state the claims of the defense with respect thereto, where he was not requested to state such claims of the defense, and where he did not attempt to sum up or restate the evidence or express any opinion upon it, but expressly charged the jury that the weight and effect of the evidence was wholly for them.

6. Where the question of defendant's guilt is fairly left to the jury upon the entire evidence and with correct instructions, the omission to give other instructions which, though proper in themselves, were not asked for and were not necessary in point of law, is not error.

7. The exclusion of other witnesses from the court room while a witness is testifying is a matter entirely within the discretion of the trial court.

8. It was not error, on a trial for murder by strychnine poisoning, to permit the mother of the deceased, although not an expert witness, to state the apparent effect the administration of chloroform had upon her daughter after the poisoning.

9. A physician who, in addition to his knowledge gained from study of the books on the subject, had attended one case of strychnine poisoning besides the one in question, was competent to testify as an expert, although when he attended such previous case he had not yet received a diploma from a medical college. *Soquet v. State,* 72 Wis. 659, distinguished.

10. A physician, having testified in a general way as to the symptoms of strychnine poisoning, was asked on cross-examination, " Can you conceive of such a thing as a young girl twenty-three or twenty-four years old withstanding thirty-five strychnine convulsions?" *Held,* that it was not error to exclude such question on the ground that the facts upon which the opinion asked for was based should have been put before the jury by a hypothetical question.

11. It was not a material error to permit a physician to answer a hypothetical question as to the cause of death, where such question, though objected to on the ground that it did not state all the facts, did state all facts absolutely essential to enable the witness to form an intelligent opinion, and where he was cross-examined fully as to the facts embraced in it and also as to the facts claimed to have been omitted. *Vosburg v. Putney,* 80 Wis. 523, distinguished.

12. An error in refusing to permit a witness to be asked on cross-examination as to a discrepancy in her testimony given at the inquest and that given by her on the preliminary examination, was cured by subsequently allowing her to be fully interrogated upon that subject.

13. After a verdict of guilty and before a motion for a new trial had been filed, the trial judge stated to a newspaper correspondent that he was firmly convinced that the evidence warranted the conviction. *Held,* that this was not an infringement of the right of the defendant to have a motion for a new trial heard.

ERROR to the Circuit Court for *Richland* County.

An information was filed in the circuit court of Richland county, charging the plaintiff in error with having on the 8th day of January, A. D. 1891, at said county, feloniously, wilfully, and with malice aforethought killed and murdered one Ella Maly, against the peace, etc.    After pleading not guilty to the information, a change of venue was awarded to the circuit court for Grant county, where the case was tried and a verdict was rendered finding the plaintiff in error guilty of murder in the first degree.    Upon this verdict she was sentenced to confinement in the state prison for life.    The record of the evidence given at the trial is very voluminous, and the rulings complained of numerous.    A motion was made for a new trial on the ground that the verdict was against law and against the evidence; for errors in the court in remarks made in the presence and hearing of the jury during the trial; for the refusal of the court to exclude witnesses for the state from the court room while other witnesses were being examined, as requested by defendant's counsel; for errors of the court in admitting improper testimony over objections of the defendant; in rejecting proper testimony offered by the defendant; and in refusing to allow the defendant to ask proper questions of the witnesses on cross-examination; and for error in the charge of the court.

The plaintiff in error, an unmarried young woman, came to Richland Center in 1888, where she was employed and made her home at the house of Dr. Mitchell.    Afterwards she began working in the millinery business, and so continued to the time of the death of Ella Maly, still making her home in the family of Dr. Mitchell, with whom she

lived on intimate terms.   At the first Christmas after she
came there, in 1888, she and Dr. Mitchell and Mrs. Mitchell
exchanged presents, and so at the subsequent Christmas.
In February, 1890, Mrs. Mitchell gave birth to a child, and
was in ill health for some considerable time, but not
seriously ill.   She died quite unexpectedly on the 25th of
March, 1890.   For several hours preceding her death she
was in the exclusive care and charge of *Rose Zoldoske* and
her son, Freddy Mitchell, a youth about ten years of age.
During a portion of this time the accused was in the bed-
room alone with her.   Mrs. Mitchell died in spasms and
convulsions, manifesting symptoms of strychnine poisoning.

Among other things kept in the house of Dr. Mitchell
was a small bottle containing strychnine, in his cabinet in
the parlor, not sealed, having an ordinary cork, which any
person could remove without difficulty.   It was purchased
to poison rats and other vermin, the family having been
annoyed by rats and mice.   Some time prior to his wife's
death, Dr. Mitchell took this bottle out from his cabinet to
the dining-room table, and prepared some strychnine and
cheese to poison rats.   This was done while *Rose Zoldoske*
and Freddy Mitchell were present.   The bottle had a regu-
lar poison label upon it, with "strychnine" printed in the
English language, and was in a position in the cabinet
where any member of the family could get it, and it con-
tained from one fourth to one third of a teaspoonful of
strychnine.

Considerable testimony was given tending to show that
the accused became enamored of the doctor and was desir-
ous of marrying him.   After the funeral she objected to
Mrs. Mitchell's sister taking the baby to Monroe to care for
it, and she continued as a member of the household, caring
for the child and Freddy somewhat, and giving some atten-
tion to the household affairs.   Dr. Mitchell's family con-
sisted of an old lady, Mrs. Handy, who did some work

about the house and took care of the baby, his son Freddy, and the hired girl, Anna Kistler. After Mrs. Mitchell's death, the accused refused to go into the room where her corpse lay, and made the remark to one of the witnesses that money could not hire her to go into that room, and also stated that Mrs. Mitchell had said to her that if she (Mrs. Mitchell) should die the doctor would be paying attention to her (*Rose Zoldoske*) within two months, and would marry her within six months. After Mrs. Mitchell's death she (*Rose*) retained her position in the millinery store. No further attention was given to the sudden and unexpected death of Mrs. Mitchell until after the death of Ella Maly, January 9, 1891.

During the month of October, 1890, *Rose* went to the house of Mrs. Emma Hyndman in considerable excitement, entered without knocking, and said to Mrs. Hyndman she came to talk about Dr. Mitchell; that he had not acted natural of late; that she did not know why; that perhaps Mrs. H. might have some influence with him. Mrs. H. finally said, " *Rose*, do you want me to recommend you to the doctor?" She answered she did. Mrs. H. saw *Rose* shortly after this, and *Rose* remarked, "It's all right, now."

In November, *Rose* went to the office of Dr. Lovering, pretending to want some medicine for a pain in her side, though she was then living at the home of Dr. Mitchell. Mrs. Lovering being present, *Rose* said to the doctor she would like to have a talk with him in private. Mrs. Lovering left the room, and *Rose* said to the doctor, "I want you to do me a favor." She wished him to speak with Dr. Mitchell; that Dr. Mitchell thought a good deal of him, and believed what he said; that Dr. Mitchell had told her before that he (Dr. Lovering) had picked him out a good woman, and she was a jewel, and if he would speak a good word for her it might have some influence with the doctor;

that she had taken care of the children a good while, and he ought to marry her; that, if he would speak a good word for her to the doctor, when he married her she would give him $10. She subsequently called on Dr. Lovering, and inquired if he had seen Dr. Mitchell, and, on being informed that he had, she wished to know how he seemed,— whether he cared anything for her; and inquired of Dr. L. if Dr. Mitchell cared anything about May Hyndman. Soon after these interviews Dr. L. received a letter, unsigned, which the proof tends to show was in the handwriting of *Rose*, containing a five-dollar bill, which was as follows: "Dear Friend: You have done well. I will give you $5 now, and the other when your work is finished. Burn this up. Yours, ———. P. S. I can see a great change in the doctor. · He gave me the loveliest Christmas present you ever saw. *I know you did good work.* Yours ever." Dr. L. called on her and offered her back the $5, saying that what he did was not for pay, and that she must take it back. She insisted on his keeping it as a Christmas gift.

Previous to Christmas, 1890, Dr. Mitchell had occasionally ridden out with Ella Maly; on one occasion had spent some time with her preparing music and a program for exercises of the Methodist and Baptist churches at Richland Center; and on one occasion Ella Maly called at his house in respect to the entertainment, and met the doctor in the parlor, *Rose* being in an adjoining room, the doors to which were at first open, but presently the doctor closed them. After a short time he and Ella went out together, and he accompanied her up the street in the direction where she was employed. Considerable testimony, circumstantial and otherwise, was given tending to show that *Rose* became extremely jealous of Ella Maly; and it was conjectured that the doctor might marry Ella Maly.

On the 8th of January, 1891, *Rose* got up a party at Dr. Mitchell's house, inviting several young ladies, and, among

others, Ella Maly and her sister Lilly. She procured for supper that evening some oysters, which were served in soup, and oranges, and one of the other girls furnished cake. On that afternoon *Rose* attempted to purchase in one store five cents worth of oysters, and was refused. Going to another store, she purchased five cents worth of oysters, stating at both places that she intended to take them home and try them, as she expected to purchase some for the party that night. The evidence shows that she did not bring them home with her. She had, it appeared, purchased oysters before in such small quantities. After making the purchase of five cents worth of oysters she went to Bailey's store, where Miss Maly was employed, appeared excited, and passed Miss McKay at the door, with whom she was well acquainted, without speaking to her, although she met her face to face. She appeared to have no business in the store, except to request Miss Maly to invite Miss McKay to attend the party that evening, and, though she met her at the door, did not herself invite or speak to her. After she left Bailey's store she purchased five cents worth of chocolate creams in one store, and passing from there to another, bought another similar package of chocolate creams.

The testimony shows that strychnine has an exceedingly bitter taste, and that it can be taken without much fear of detection in a raw oyster or chocolate creams. The invited guests arrived at the house of Dr. Mitchell, some of them between 4 and 6 o'clock, and Ella Maly and her sister at about 6. Shortly after Anna McClaren, then employed at Dr. Mitchell's, who prepared the supper, announced that it was ready, when the young ladies repaired to the dining room, taking places as designated by *Rose*, she sitting down with the others. Shortly after she had taken her seat, and before they began to eat, she excused herself, saying that she was sick. She passed out of the back door, came around

the house, and in at the front door, and went upstairs to her room.  The other young ladies finished their supper, when Miss McClaren, on request of *Rose*, asked May Hyndman to step up to her room.  When Miss Hyndman went up into the hall, she found *Rose's* room at the end of the hall, and no light in it, and as she approached the room door she saw the shadow of a person on the wall in the hall moving about in *Rose's* room.  When *Rose* heard her approaching, she threw herself down on the bed, but the bed was not in such a condition as to indicate that she had been lying down.  She pretended to be very sick.  When Miss Hyndman, who remained in the room a few minutes, was about to go downstairs, *Rose* said, "Tell Ella Maly to come up.  I want to see her;" and added, as she was going out of the door, "I want to talk with her about a book." Ella Maly, upon request of Miss Hyndman, went to *Rose's* room, remaining there with her alone but a few minutes, and returning to the parlor.  Shortly after *Rose* joined them.  Ella Maly and her sister remained some time after *Rose* came downstairs, Ella and Freddy playing the organ and singing.  Ella Maly also went into the kitchen, and helped Miss McClaren wash dishes.  While she was in the kitchen *Rose* began a conversation with Lilly Maly, stating, without any suggestion from the latter, in substance, that it was strange how many persons were now having convulsions; that persons who appeared perfectly well would in a few minutes go into convulsions and die; that the "air was actually filled with it."

At about 8 o'clock Ella Maly and her sister arose to go home.  *Rose* took them into an adjoining room to get their wraps, which was without a light, except as reflected from a hanging lamp in the other room.  After stepping into that room where it was somewhat dark, she took a package of candy which was on the bureau, poured out some in her hand, and gave it to Lilly Maly, and poured out some

more, and gave it to Ella Maly. About that time Miss McClaren came into the room with a lamp. The girls started home, and immediately after they left the house *Rose* sat down to the table and ate quite a hearty supper. As they were leaving Dr. Mitchell's house, Ella Maly ate one of the chocolate creams which she had just received from *Rose* in the room. After they had got a little farther towards home she ate another, and remarked how bitter it ·tasted. Within a few minutes thereafter she spoke about strange and peculiar sensations which she felt in her lower limbs; she had never felt anything like it before, and seemed to become very much excited and frightened. She said it was creeping up her limbs; that it was in her arms; that she could walk no further; fell down in the snow, and before long went into convulsions. She was heard moaning at a distance of one block while she lay there. Dr. Mitchell was immediately called, also Dr. Haskell. After Dr. Mitchell left his house, *Rose* and Anna McClaren and Freddy Mitchell began playing dominoes, and the doctor soon returned for some medicine. After he left the house, *Rose* refused to play; said she could not play any more; that Ella must be awfully sick, the doctor looked so pale. Miss McClaren and Freddy soon after went to bed, but *Rose* remained up, either walking the floor or lying on the lounge, and did not go to her room during the entire night.

After Ella Maly was first so affected, convulsion after convulsion followed, until about 12 o'clock at night, when there was a period of about three hours and a half during which she had no convulsion, and the medical testimony tends to show that convulsions had been retarded by morphia and chloroform, which were given her; but they again returned, and continued until she died, about 7 o'clock in the morning. The testimony set forth her symptoms and the character of the convulsions fully, and the attending physicians and several other physicians testified that

they were unmistakably those of strychnine poisoning. The evidence shows that half a grain is a fatal dose. There was a *post mortem* examination of Ella Maly, and strychnine was found in the contents of the stomach and liver. Professor Haines extracted and purified three eighths of a grain of strychnine, and testified that a larger quantity was undoubtedly taken. The testimony of Dr. Bellfield, of Chicago, a specialist on kidneys and kidney diseases, was that Ella Maly was in a perfect state of health, and that she did not die of any kidney disease or uræmic poisoning. The testimony further shows that the medicine given Ella Mally on the night of the 8th of January and the morning of the 9th contained no strychnine, and that the embalming fluid contained none. The proof tended to establish, without contradiction, that Ella Maly died of strychnine poisoning; that she was of the age of about twenty-three years, in good health and cheerful spirits, and employed as book-keeper in a store at Richland Center, where she had worked continuously for a period of four years without missing a day from sickness; from the time she had her supper, shortly after 6 o'clock, to the time she left Dr. Mitchell's, she neither ate nor drank anything; from the time she left Dr. Mitchell's house to the time she was taken sick she had taken nothing into her system except a portion of the chocolate creams given her by *Rose* as she was about to start home, and that she was taken sick within fifteen or twenty minutes after she had eaten the creams; that *Rose Zoldoske* had at this time a motive in destroying the life of Ella Maly, namely, to prevent her marrying Dr. Mitchell; and that there was strychnine in a bottle at Dr. Mitchell's on that evening; and that fact was known to *Rose Zoldoske*.

After it was suspected that Ella Maly had died from strychnine poisoning, *Rose* said it certainly could not be from anything she had eaten, because all the girls had eaten

the same food, but she never mentioned the fact that Ella had received from her this candy. On the morning of Ella's' death, she (*Rose*) went to her place of business without knowing that Ella had died, but shortly after she learned the fact. At this time, however, there was no suspicion resting on her. She at once became very much excited, and took sick, and came home assisted by Mrs. Wilson; said death always affected her very seriously. At 11 o'clock that day Dr. Mitchell returned home, and said that suspicion rested on *Rose*. After the doctor went out she became very nervous, went up stairs and began moaning and making such a strange noise that she attracted the attention of Miss McClaren, who was in the parlor. She said to Miss McClaren, "Suppose there was poison found in · Ella's stomach, could they tell what the poison was taken in?" She spoke about the penitentiary, and said, "If one was sentenced to the penitentary, would it be a life sentence?" Miss McClaren, who was in the house with her, said, "I suppose the house will be searched, so that they can ascertain if there was anything about the house to cause suspicion to rest upon it." *Rose*, immediately after this suggestion, went upstairs, and soon came down with a small package in her hand, went to the stove, lifted the lid off, and put it in. In speaking of the death of Mrs. Mitchell, she said Mrs. Mitchell might have eaten poison herself; that the doctor might have got her in the notion of taking it, and she was sick and appeared cross, and might have eaten it again.

In referring to the *post mortem* examination of Ella Maly, *Rose* said she thought Mrs. Maly ought not to permit it; that it would not give her any satisfaction, but be a terrible thing. Several witnesses testified that they, in company with *Rose*, sat up as watchers the night after Ella Maly died; that when the others went into the room and viewed the corpse, *Rose* did not; that she never went into

the room that night.   During the night they were discuss-
ing the sad death of Miss Maly, and shed tears, but *Rose*
showed no emotion whatever.   On the day of the funeral
*Rose* accompanied other parties to the church, but it was
filled with people, and they were obliged to go to the par-
sonage until after the funeral services were performed.
When the services were over the people passed up the aisle,
viewed the corpse, and passed down through on the other
side.   *Rose Zoldoske* started to go up the aisle to view the
corpse, and was taken sick, and had to be assisted out of
the church by several present.   She was carried to the
parsonage, and one of the doctors who made the *post
mortem* examination of Ella Maly stated they had made
such examination, and that everything was all right.   She
remarked she "was very much afraid it was not all right."
In conversation with a witness she said, "Don't you think
it is awful for the doctor to allow Mrs. Mitchell's body to
be taken up?"   Witness remarked, "No, he ought to do
that."   "Well," she said, "do you think the doctor would
do such a thing?"   Witness says, "What?"   She says,
"Do you think the doctor would give her anything to kill
her?"   At this time there was no knowledge or report
whatever as to what caused the death of Mrs. Mitchell.

After she was committed to jail, on January 14th, she
wrote a letter to Miss May Hyndman, in which she says,
among other things: "I hope and pray that everything is
all right.   Mrs. Ludwig says she is sure it is, and Dr. Lud-
wig said he knows that the candy was; they have proved
it; and he said it was all right if I could prove that I did
not send for her to come upstairs.   I said I could prove it;
I asked for you, and you said the same as I did.   I could
swear to it.   Oh, I hope and pray you will say the same.
That is all that will save me.   I know I am innocent, and
God — I told them I knew that you would stand by me,
and I hope and pray you will.   I will pay you well.   I said
you told me you was sorry I felt bad.   Swear to this in

the letter you write. I said like this, I wanted to see you to tell you why I left the table, and you come up and said, 'We are all going to church except Lilly and Ella, and would you like to see her.' Dr. Ludwig said for me to get you to say that, and it would be all right. So, dear Mabel, do you know that was all. Oh, God, help me, you will swear to it. Remember and write these few words, 'I sent her on my own accord.' I said like this, I would like to see you, and you said, 'We are all going to church except Lillie and Ella, would you like to see her?' I said, 'Yes.' Oh, May, I hope you will stand by me. I tell that you sent her because you could not stay with me, so you sent her on your own accord. They said it would be all settled. God knows it is all right. Please answer by next mail, so I can prove it. They are almost all on my side now. Be sure, dear May, and write that back. Dr. Ludwig said he was sure it was settled, and Mrs. Ludwig said she hoped and prayed it was all right, for she heard some one say you sent Ella up yourself, because you did not want to leave me alone, and I said I could prove it, I did not send for her. I sent for you, and you could not stay and sent her. May God help me, you are the best proof I have. Answer by next mail." Dr. Ludwig testifies he never made any such suggestion as *Rose Zoldoske* intimated in this letter.

Some time after the death of Ella Maly the body of Mrs. Mitchell was exhumed, and a *post mortem* examination was had, resulting in the discovery of traces of strychnine, and proof was given that Professor Haines extracted and purified over one twelfth of a grain from her stomach. He testified that strychnine decomposes in time, and that a much larger quantity must have been taken, in order to find one twelfth of a grain at such a late period. Proof was also given tending to show that Mrs. Mitchell died of strychnine poisoning and in severe convulsions.

The boy Freddy Mitchell testified that he was anxious his

Zoldoske vs. The State.

father should not get married again, and he had said three or four times he would kill a stepmother if his father married; that he had heard *Rose* say, if she had a stepmother she would shoot her.; that he did not give Ella Maly anything to eat on the night in question.

Considerable testimony bearing on the subject of Mrs. Mitchell's death was tendered and received, defendant's counsel making no objection thereto, but stating that they regarded the testimony of the treatment and of the death of Mrs. Mitchell as not having anything to do with the indictment for the murder of Ella Maly, and that it was immaterial, but that they did not want any shadow to hang over the defendant, but wanted and desired a thorough investigation of the matter, provided they were allowed to cross-examine on it. Dr. Mitchell testified that the bottle containing strychnine was in the same condition on the 8th day of January as when his wife died, March 25, 1890; that he examined it after the death of Ella Maly, and. could not see that any had been removed, but two grains or so might have been taken without his being able to notice it.

At the commencement of the trial, counsel on the part of the defendant requested the court to exclude from the court room all witnesses on the part of the prosecution except the one on examination, but the trial judge, after some discussion, said, " I see no really good reason why this rule should be enforced in this case; " and denied the request.

Dr. M. W. Haskell was examined, and testified to his attending Ella Maly on the night of January 8, 1891, in company with Dr. Mitchell and others, and until her death. He gave a very full description of her case, and the manner in which she was treated; testified as to what would be the symptoms of strychnine poisoning, and that, in his opinion, she died from asphyxia, caused by a spasm of the respiratory muscles, and possibly exhaustion, combined,—

Zoldoske vs. The State.

from strychnine poisoning. He testified that he was a graduate of a medical college at Fort Wayne, and had practiced seventeen years; had attended one case where a person was laboring under the influence of strychnine poisoning; had made a study of strychnine poisoning at that time and subsequently, and studied nearly all the toxicological works by eminent authorities in America and England; that he was formerly a member of the Southwestern Wisconsin Medical Association; and, being asked what symptoms he discovered which led him to think that Ella Maly's case was one of strychnine poisoning, the defendant objected, and a discussion arose on the subject, in which the case of *Soquet v. State*, 72 Wis. 659, was mentioned. The circuit judge proceeded to remark to some considerable extent upon that case and its particular features, and said: "It is one of those hard cases which are said to make bad law," and that he had always regarded this case as bad law, but that it is the law of this state, although he did not think it correct in principle, and proceeded to state what he considered to be the correct rule; that, in this case of so much importance to the defendant, "he would not follow what he believed to be the rule, but what the supreme court had laid down as the law in the case of *Soquet v. State;* that the law as thus laid down would be the law governing the trial as to the competency of experts." Exceptions were taken by the counsel for defendant to the above remarks of the court. The objection was then sustained, and witness was asked, "What are the symptoms of strychnine poisoning?" to which defendant's counsel objected, and his answer was received, which was quite full. Afterwards the defendant's counsel moved to strike out all of the testimony of this witness on this subject, upon the ground that he was not a physician at all when he attended the case of strychnine poisoning in Ohio, and the court granted the motion, with the right to admit

the testimony later if it should be advised that it would be
right to do so. The defendant's counsel cross-examined
the witness to some considerable extent, and finally with-
drew the motion to strike out his testimony, and consented
that the opinion he had expressed stand as a part of the
testimony in the case, but subsequently concluded to insist
on the motion; whereupon the court granted the motion to
strike out all his testimony given as an expert on the ques-
tion of strychnine poisoning; and the counsel for the de-
fense also excepted to the refusal of the court to allow
them to ask Dr. Haskell if there was not a judgment then
hanging over him in Richland county, obtained for alleged
malpractice.

It appears that Lilly Maly, upon her examination upon
the inquest, testifying in relation to what was said between
herself and her sister Ella on their way home from Dr.
Mitchell's, said that she mentioned, or it was mentioned,
that the creams were very bitter. On the examination be-
fore the magistrate she testified that this remark was made
by her sister, Ella Maly. Defendant's counsel, on cross-
examination, asked her to explain to the jury why she had
changed her testimony. This was objected to, and the ob-
jection was sustained, but the defendant's counsel inter-
rogated her immediately afterwards in relation to that
matter, and drew out a full and detailed statement from
the witness, explaining the alleged change in her testimony
fully, and which was admitted without objection.

*L. H. Bancroft* and *H. W. Chynoweth,* for the plaintiff in
error, contended, among other things, that evidence of the
commission of one crime is no evidence as an independent
fact of the commission of another, and it is the duty of the
court in its instructions to limit such evidence to the ques-
tion of motive and intent. *Comm. v. Shepard,* 1 Allen, 575;
*Wheeler v. State,* 23 Tex. App. 598; *Taylor v. State,* 22 id.
529; *Davidson v. State,* id. 372; *Kelley v. State,* 18 id. 262;

*House v. State,* 16 id. 25; *Mayfield v. State,* 23 id. 645; *Barton v. State,* 28 id. 483. It is error for the court to make suggestion of facts or circumstances which are prejudicial to the defendant, and at the same time not to state facts which are in her favor. *Morgan v. State,* 48 Ohio St. 371; *Smith v. State,* 88 Ala. 23, 73; *Lefler v. State,* 122 Ind. 206; *Goursen v. Comm.* 99 Pa. St. 388; *Dingman v. State,* 48 Wis. 485; *Hill v. State,* 17 id. 675; *Comm. v. Hourigan,* 89 Ky. 305; *Chicago, B. & Q. R. Co. v. Griffin,* 68 Ill. 499. Where circumstantial evidence alone is depended upon for conviction, it must show that the defendant committed the crime and that nobody else did, and must exclude all hypotheses inconsistent with the theory of defendant's guilt and establish it beyond a reasonable doubt; and it is of vital importance to the defendant that the jury should be instructed fully and clearly upon the question of reasonable doubt. Kerr, Homicide, secs. 516, 518, 528; Greenl. Ev. sec. 34; *People v. Lachanais,* 32 Cal. 433; *Algeri v. State,* 25 Miss. 584; *Pitts v. State,* 43 id. 472; *Finlan v. State,* 13 S. W. Rep. (Tex.), 866; *Anderson v. Comm.* 84 Va. 77; *Territory v. Rehberg,* 6 Mont. 467; *Brookser v. State,* 26 Tex. App. 593; Wills, Cir. Ev. 188, rule 4, and 189; *People v. Nelson,* 85 Cal. 421; *State v. Moxley,* 102 Mo. 374; *Daniels v. State,* 14 S. W. Rep. (Tex.), 395; *People v. Aikin,* 66 Mich. 460.

For the defendant in error there was a brief signed by the *Attorney General,* and oral argument by *F. H. Burnham* and the *Attorney General.*

PINNEY, J. 1. It is earnestly contended by counsel for the defendant that in this case the *corpus delicti,* by which is meant the essential substance in law of the offense charged, has not been proved; that possession by the defendant of the deadly poison which clearly caused the death of Elia Maly has not been shown; that this is legally essential to a

conviction. A passage in Wills, Circ. Ev. 219, founded on the case of *Reg. v. Graham* at the Carlisle assizes, but which is not found in any report within our reach, is cited. The author lays it down that "the possession of poisonous matter by the party charged with the administration of it is. always an important fact, and where death has been caused by poison of the same kind, and no satisfactory explanation of that fact (possession) is given or suggested by the surrounding circumstances, a strong inference of guilt may be created against the accused;" and he states in this connection that "not only must it appear that the accused possessed the deadly agent, but it is indispensable to show that he had the opportunity of administering it." He quotes, too, the language of Mr. Baron ROLFE in *Reg. v. Graham:* "There was also another question which was most important: it was whether the party who had the opportunity of administering poison, had poison to administer."

This may all be conceded, but it does not follow that the proof that the accused had possession of poison to administer must be direct and positive, or that she had it in her exclusive possession. The substance of the offense may be proved as well by circumstantial as by direct evidence, and it is enough to show that poison was immediately at hand, in the house in which she lived, in a cabinet usually unlocked in the parlor, and that she had knowledge of the fact; that it was within her easy and immediate reach. All this the evidence clearly tended to prove. The same learned author says that "no universal and invariable rule can be laid down, and every case must depend on its own particular circumstances; and, as in all other cases, the *corpus delicti* must be proved by the best evidence which is capable of being adduced, and such an amount and combination of relevant facts, whether direct or circumstantial, as establish the imputed guilt to a moral certainty, and to the exclusion of every other reasonable hypothesis." .

In *Tawell's Case* a similar question was presented, where it was contended that there ought to be positive proof of the *mode* of death, and that such a quantity of poison was found in the body of the deceased as would necessarily occasion death; but Mr. Baron PARKE told the jury that "if the evidence satisfied them that the death was occasioned by poison, and that poison was administered by the prisoner,— if that is proved by circumstantial evidence, it is not necessary to give direct and positive proof what is the quantity which would destroy life, nor is it necessary to prove that such a quantity was found in the body of the deceased, if the other facts lead you to the conclusion that the death was occasioned by poison, and that it was knowingly administered by the prisoner. The only fact which the law requires to be proved by direct and positive evidence is the death of the party." Wills, Circ. Ev. 233, 234. And LORD CAMPBELL, in *Palmers' Case*, said that " it was not to be expected that witnesses should be called to state that they saw the deadly poison administered by the prisoner, or mixed up by the prisoner, openly before them. Circumstantial evidence as to that is all that can be reasonably expected; and if there were a series of circumstances leading to the conclusion of guilt, a verdict of guilty might satisfactorily be pronounced." Id. 235; Trials for Murder by Poisoning, 42, 43.

We think it is clear that the evidence given was competent to establish the body or substance of the offense charged, and it appears to have been submitted with proper instructions to the jury. The verdict of the jury cannot be disturbed on the ground urged by counsel; and as there was evidence given from which the jury might fairly find the existence of every essential element of the crime with which the defendant was charged, and having found that she was guilty, their verdict cannot be set aside as contrary to the evidence. A discussion of the evidence would serve

no useful purpose.   The evidence tends to show that the
defendant was enamored of Dr. Mitchell, and was deter-
mined to secure him as a husband if possible, and that she
regarded the deceased, Ella Maly, as a rival and an obstacle
to her success.   There was evidence from which the jury
might well find a motive for the crime with which she was
charged.

2. The court charged the jury, upon the subject as to
whether the strychnine poison which caused the death of
Ella Maly was taken by her by accident, that " it is proper
for you to consider what the testimony shows of the death
of Mrs. Mitchell in the early part of the year 1890.   Does
the evidence in this case convince you beyond reasonable
doubt that she died of strychnine poison, and that the
strychnine which killed her was not the *nux vomica* which
Dr. Mitchell prescribed for her?   If it does not, then her
death can have no *bearing* upon the question now under
consideration, nor upon any other question in this case.
But if you should determine the question just suggested in
the affirmative, and should also be convinced beyond a rea-
sonable doubt that at the time of Mrs. Mitchell's death
Dr. Mitchell's family consisted of several members, of whom
this defendant was one, and that none of the others were
poisoned, the fact of her death may be considered by you
in determining whether Ella Maly's death was chargeable
to *accident* or not.   To convict, you must be convinced be-
yond a reasonable doubt that Ella Maly did not die from
strychnine *accidentally* taken."   And this is assigned for
error.

The substance of this instruction is that if the jury should
believe, beyond a reasonable doubt, that the death of Mrs.
Mitchell was caused in the early part of 1890 by strych-
nine poison, not the *nux vomica* prescribed by Dr. Mitchell,
while the defendant was a member of the Mitchell family,
and that none of the others of the family were poisoned,

then the fact of her death by that means might be considered by the jury in determining whether the death of Ella Maly was chargeable to *accident* or not.  If they were not so convinced, then the death of Mrs. Mitchell could have no bearing upon this question, or any other in the case.  That to convict they must be convinced beyond a reasonable doubt that Ella Maly did not die from strychnine accidentally taken.  There is no testimony whatever in the case having the least tendency, in our judgment, to show that Ella Maly took the strychnine poison, of which she no doubt died, accidentally.  The instruction, however, if material, is clearly correct.  Counsel for defendant insists that the effect of such testimony should have been strictly limited to the question of motive and intent.  The cases cited in support of this view hold only that such evidence is competent on this question.  They are none of them cases of murder by poisoning, and they do not hold, or assume to decide, that in such a case such evidence, while it is proper evidence of motive and intent, may not be used, as it was in this case, to show that the deceased did not take the strychnine poison, of which she died, *accidentally.*  The correctness of the charge is abundantly sustained by many authorities, and we know of none to the contrary.  Wills, Circ. Ev. 238, 239.

In *Queen v. Geering*, 18 Law J. M. Cas. 215, the prisoner was indicted for the murder of her husband in September, and evidence was tendered by the prosecution of arsenic having been taken by the prisoner's two sons, one of whom died in December, and the other in March subsequently, and also by a third son, who did not die.  The prisoner lived in the house with her husband and sons.  Proof was given, as in this case, of a similarity of symptoms in the four cases; but the testimony was objected to on the ground that the facts proposed to be proved took place subsequent to the death of the husband, and that the effect of the evi-

dence was to show the commission of three distinct felonies, but it was conceded that the evidence would have been receivable had the deaths of the sons taken place previously to the death of the husband. POLLOCK, C. B., held that the evidence was receivable for the purpose of proving, *first*, that the death of the husband, whether felonious or not, was occasioned by arsenic; *second*, that the domestic history of the family during the period that the deaths occurred was receivable to show that during that time arsenic had been taken by four members of it, with a view to enable the jury to determine as to whether such taking was *accidental* or not; and Baron ALDERSON and Mr. Justice TALFOURD concurred in this opinion. To the same effect is *Reg. v. Cotton*, 12 Cox, Crim. Cas. 400; *Reg. v. Rodin*, id. 630; *Reg. v. Garner*, 4 Fost. & F. 346; *Reg. v. Heesom*, 14 Cox, Crim. Cas. 40. The case last cited, as well as *Comm. v. Robinson*, 146 Mass. 571, and *Hawes v. State*, 88 Ala. 37, show that such testimony would be admissible on the question of criminal motive as well. But in this case no objection was made to the evidence. See, also, *Rex v. Clews*, 4 Car. & P. 221; *People v. Stout*, 4 Parker, Crim. R. 127, and cases cited. The effect of the proof was strictly limited, however, to the question whether Ella Maly took the poison of which she died, by *accident*.

It was entirely proper for the court to submit to the jury the question, "Was Ella Maly's death a natural death, or was it caused by strychnine poison?" There is no reason to contend that this was submitted as decisive of the entire case. Taken with the context, there is no reason to suppose that the jury were misled by it. The evidence does not afford any ground for thinking that Ella Maly committed suicide, and the instructions given on that subject are not objectionable. The correctness and fairness of the charge are to be determined, not from a detached sentence or statement, but from its fair meaning and effect as a whole.

.It is objected that the trial judge in his charge singled out partial statements of facts, and did not embrace in his suggestions all of the facts bearing upon the questions, and that it was error to make suggestion of facts and circumstances which are prejudicial to the defendant, and at the same time omit to state facts which were in her favor; that the trial judge stated the claims of the state, but did not state those of the defense; that he told the jury that he was responsible for the evidence upon which they were to decide the case; that the weight of the evidence was wholly for them. In this connection he stated to the jury that the responsibility of determining what the evidence proves or fails to prove was wholly with them, and that he had carefully refrained from any attempt to restate it, lest in so doing he might unintentionally impress them with the belief that he had an opinion or conviction upon it. The only statements which the judge made of the claims of the state were two: (1) That the state claimed that Ella Maly was poisoned by strychnine; and (2) that in another part of the charge he said: "It is claimed by the state that nothing was eaten by Ella in Dr. Mitchell's the night of January 8th, except what she partook of with the other guests, but that the defendant gave her some chocolate cream candies, of which she ate soon after leaving the house, and that one of these chocolate creams had within it the fatal dose of strychnine, and that within a short time after she had eaten what she did of them the fatal effects began to manifest themselves." We do not think there was anything unfair or improper in this. It was a necessity that the judge should state in general terms the nature of the charge. In this connection he did not, nor did he elsewhere in his charge, attempt to sum up or restate the evidence, and his omission to state there was evidence that an analysis of the remainder of the candy found in Ella Maly's pocket showed that they did not contain any poisonous

matter cannot afford any just ground for complaint. And so, too, of the fact that after the terrible agony and convulsions ensued of which she died, and while under the influence of chloroform and morphine, Ella Maly, although interrogated as to what she had eaten, made no answer, except to say, "I hear you." The trial judge did not express any opinion whatever upon the evidence, but expressly informed the jury in the most pointed manner that the weight and effect of the evidence were wholly for them. If the defense had presented its claims in the form of instructions asked, there is no reason to doubt but that they would have received proper consideration; at least the defendant would have been in position to have assigned error for any improper refusal in this respect.

The body of the charge is, in the main, in substance like that of Chief Justice SHAW in *Comm. v. Webster*, 5 Cush. 309, which, like this, depended almost entirely on circumstantial evidence; and in that case the jury were told, in substance, that in order to justify the inference of guilt the inculpatory facts must be incompatible with the innocence of the accused, and incapable of any other reasonable hypothesis than that of his guilt; and it is assigned as error that in this case no such instruction was given. It would have been proper to have given such an instruction in this case, as well as some others which have been suggested; but the failure to give them, no request therefor having been made, is not error, where the question of the defendant's guilt is fairly left to the jury, as in this case, upon the entire evidence.

At the close of the charge the defense asked the court "to further charge to the effect, under the statute, that no presumption arises against the defendant on account of no evidence having been produced by her." The court said that was correct, and read to the jury sec. 4071, R. S., and asked defendant's counsel if he desired any further instruc-

tion upon this point, to which he replied, " No, that is suffi-
cient," and no other instruction *upon any point was asked.*
It is not error, where the question of defendant's guilt is
fairly left to the jury upon the entire evidence, for the
trial judge to omit to give unasked instructions proper in
themselves, but not necessary in point of law, provided
those given are correct. *Knoll v. State,* 55 Wis. 256, 257;
*Winn v. State, ante,* p. 571. There was no error, we think,
in the instructions given. We do not think that the in-
structions are open to objection as being argumentative,
nor because the court presented separately and in their
order the questions whether Ella Maly committed suicide,
and whether her death was the result of accidental poison-
ing; indeed, it was proper that these questions should be
separately considered in the light of all the evidence.

Although the deceased had thirty-five or more convul-
sions before her death, her life was prolonged an unusual
and even extraordinary length of time after the strychnine
began to operate. It is in evidence by medical experts
that the remedies administered arrested temporarily the
action of the poison; that the chloroform gave out, and
convulsions recurred. The evidence is certainly very satis-
factory that Ella Maly died from strychnine poisoning.
No one of the several able medical experts expressed the
slightest doubt on the subject, but all concurred in this con-
clusion. It was left for the jury to determine whether,
beyond a reasonable doubt, the death of Ella Maly was the
result of strychnine poisoning, and there was abundant tes-
timony to justify the jury in the conclusions at which they
arrived that such was the cause of her death.

3. The matter of exclusion of other witnesses from the
court room during the time any witness is testifying is en-
tirely a matter of discretion, and not of right, and we do not
think there is anything in the record to show that this dis-
cretion was not properly exercised. We do not think it was

error to permit the witness Mrs. Maly to state the apparent effect the administration of chloroform had upon her daughter Ella, or for the trial judge to make the remarks in relation to Mrs. Maly's evidence on behalf of the state to which exception is taken. There is no reason to think that the defendant's case was affected by them in the least.

4. There is no doubt but Dr. Haskell was competent to testify as an expert in respect to cases of strychnine poisoning. The case of *Soquet v. State*, 72 Wis. 659, follows the decision in *Boyle v. State*, 57 Wis. 479; and these cases go only to the extent that a medical witness who has had *no experience, and has never seen* a case of death by strangulation, or a case of strychnine poisoning, cannot be allowed to testify as an expert on such subjects, if his knowledge in respect thereto is derived *entirely* from reading scientific or medical books. The decision in *Soquet v. State* goes upon grounds so clearly stated and so abundantly sustained by adjudicated cases both in England and America, that it is not necessary again to refer to the authorities, many of which are cited or stated in *Boyle v. State*, 57 Wis. 479. Text-books or scientific works cannot be read in evidence to the jury, and the rule cannot be defeated or evaded by getting their contents before the jury by having a witness testify to what they contain. The subject has recently been considered in *Waterman v. C. & N. W. R. Co., post*, p. 613. The trial judge might well have been content with following the decision of this court, as it is his duty in all cases to do, without elaborately explaining his reasons for thinking it erroneous. It is a matter of taste, perhaps, in many cases, whether the trial judge shall publicly indulge in criticism of and dissent from the decisions of the supreme court, but in jury trials it is not only a manifest impropriety, but error, where they are material to the merits, as has been held in the case of *Scott v. Clayton*, 54 Wis. 499. It was error to strike out the testimony of Dr. Hask-

ell, prejudicial to the prosecution, but the defendant was not injuriously affected by it, or by any of the remarks or rulings of the trial judge relating to it, or the length of his examination.

5. Dr. Buck had testified as to the symptoms following the administration of strychnine in a general way quite fully, and on cross-examination he was asked, " Can you conceive of such a thing as a young girl, twenty-three or twenty-four years old, withstanding thirty-five strychnine convulsions? " And, on objection, the court refused to allow the question to be answered, stating that if this special case was to be inquired of, it should be by hypothetical questions based upon the evidence. The question really called for Dr. Buck's opinion, and, to be of any value, the facts upon which it was based should have been put before the jury. It did not appear that he had heard all the evidence material to this point, and we think the ruling of the court is not open to objection, even though the question was asked on cross-examination, his testimony on direct examination having been quite general.

6. The hypothetical question propounded to Dr. Bellfield did not contain a statement in detail of the minute particulars of proof, but did contain the general features of the case, and particularly of the *post mortem* appearances of the body, and what was found in it, and Dr. B. was asked his opinion as to the cause of death. The question was objected to on the ground that it did not contain a statement of all the facts. The doctor answered: " If no other information was furnished than appears, as to the *post mortem* appearances, and as to what was found after, I should say strychnine poisoning" was the cause; that the discovery of albumen in the urine would not change his opinion; that as the question states that the kidney was examined with both the eye and the microscope and found to be congested, but otherwise normal, that under such con-

ditions the patient could not have died of uræmic poisoning. Dr. B. was cross-examined at great length, not only in respect to the facts embraced in the hypothetical question, but in respect to facts claimed to have been omitted from it. We do not think the case is within the ruling relied on by the defense in *Vosburg v. Putney*, 80 Wis. 523, nor that there was omitted from the hypothetical question any fact absolutely essential to enable the doctor to form an intelligent opinion. The course and result of the cross-examination were such as to remove all ground for claiming that there was material error in this ruling prejudicial to the defendant. The rule in relation to hypothetical questions is that, if the facts upon which the hypothesis is based fall, the answer falls also (Whart. Crim. Ev. § 418); that an expert cannot be asked as to an hypothesis having no foundation in the evidence in the case, but may be asked his opinion of a similar case hypothetically stated; and it seems that counsel may assume the facts as they claim them to exist, if within the possible or probable range of the evidence. *Sills v. Brown*, 9 Car. & P. 601; *Dexter v. Hall*, 15 Wall. 26; *Cowley v. People*, 83 N. Y. 465, 470; *Dilleber v. Home L. Ins. Co.* 87 N. Y. 83; *Harnett v. Garvey*, 66 N. Y. 641; *Guetig v. State*, 66 Ind. 94; Lawson, Exp. Ev. 152, 153; Rog. Exp. Test. 64–68; *Stearns v. Field,* 90 N. Y. 640; *Turnbull v. Richardson*, 69 Mich. 413; *Quinn v. Higgins*, 63 Wis. 664. No doubt such a question may be so inadequately framed as to make it error to allow it, as in *Vosburg v. Putney*, 80 Wis. 523. We think this case is clearly distinguishable from *Vosburg v. Putney*, and that the record does not show any error in the ruling of the circuit court on this question of which the defendant complains.

7. It is assigned for error that the court refused to permit Lilly Maly to be asked, on cross-examination, " Will you explain to the jury why you changed your testimony? "

Zoldoske vs. The State.

On the examination of this witness at the coroner's inquest it is claimed she stated that when she and her sister were on their way home from Dr. Mitchell's on the evening in question, and while eating the chocolate creams, she remarked that they tasted kind of bitter, and at the preliminary examination she testified that it was her sister Ella who made this remark. This ruling was, we think, erroneous, but its prejudicial effect was entirely obviated by the fact that immediately afterwards she was fully interrogated by the defense, and gave a full explanation of the discrepancy in her evidence on these occasions. The same answer must be made to the ruling of the court in refusing to allow Miss McClaren, on cross-examination, to answer the question why she omitted to testify in respect to a particular fact at the preliminary examination included in her evidence on the trial. Upon further cross-examination by the defense the witness gave a full explanation of the omission.

8. It is assigned as error that the trial judge, after the verdict of the jury had been rendered, and on the same day, before a motion for a new trial had been filed, expressed his opinion of the verdict and merits of the case to a newspaper correspondent, to the effect, among other things, that he was firmly convinced that the evidence warranted a conviction for murder in the first degree, or else he would at once entertain (this was on Sunday) a motion for a new trial; that he was doubtful whether, inasmuch as the defendant was a woman, sympathy might not operate to produce a verdict of not guilty. The statement was revised by the judge, and was published before the motion was heard, and it was made one of the grounds for a new trial. It is urged that expressing an opinion on the guilt of the defendant, and in effect deciding the merits of the motion before it was presented and heard, was an infringement of the rule that provides for hearing and deliberation before determination; and the case of *Ohms v. State,*

49 Wis. 415, is relied on.   The opinion thus expressed by
the trial judge was founded, we must assume, upon the evi-
dence developed at the trial, and it is difficult to understand
how he could have heard it without forming his own con-
clusions as to the guilt or innocence of the accused, or how
he was legally disqualified from lawfully hearing and decid-
ing the motion for a new trial, simply because he had *ex-
pressed* his convictions thus formed.   It was competent for
him to decline to hear argument in support of the motion,
and overrule it.   He, however, heard the motion, and de-
nied it.   We do not think the rights of the defendant, as
secured by the law, were infringed.   The accused has no
more right to complain of what occurred than if the trial
judge, refraining from expressing any opinion, had over-
ruled the motion, refusing, as he might properly have done,
to hear any argument upon it.   What the law requires is
that the motion shall be heard by the judge who presided
at the trial, and this is the rule of *Ohms v. State, supra,* as
explained in *Schuster v. State,* 80 Wis. 121.

Many other points were assigned for error, but not in-
sisted upon at the argument.   We have examined them in
connection with the bill of exceptions, and do not think
any of them merit particular discussion.   The defendant
has been faithfully, zealously, and ably defended, and in
the trial and proceedings resulting in her conviction of this
great crime we are satisfied that no error has intervened
to her prejudice, and that the judgment of the circuit
court must be affirmed.

*By the Court.*— The judgment of the circuit court is
affirmed.