MAGNUSON, Plaintiff in error, vs. THE STATE, Defendant in error.

*April 10—May 12, 1925.*

*Criminal law: Homicide: Evidence as to other crimes: Motive: Handwriting experts: Testimony: Comparison of handwritings: Waiver of procedural irregularities by going to trial.*

1. In a prosecution for murder committed by the sending of a bomb to a member of a drainage board, which exploded and killed his wife, where the evidence showed that defendant was bitterly opposed to the drainage project and had made threats against those connected therewith, evidence tending to show that defendant blew up a drainage dredge was properly admitted as showing a reason for defendant's animosity toward the addressee of the bomb and as tending to show a plan to obstruct the completion of the drainage project. p. 132.

2. The admission of testimony that a witness had told the addressee of the bomb to "keep an eye" on the defendant, though probably not strictly admissible, is harmless, in view of the evidence in the case. p. 133.

3. Where the evidence established that specimens of handwriting were made voluntarily by the defendant without coercion, the testimony of handwriting experts, based on such specimens, was properly admitted. p. 133.

4. An instruction that defendant was a competent witness and should not be discredited merely because charged with crime, but that he was deeply interested in the result of the trial, and that the jury were entitled to consider the temptation arising to testify to a state of facts favorable to himself, was not error.  p. 134.

5. If the jury were convinced beyond a reasonable doubt that defendant blew up the drainage dredge, they could consider that fact as having a bearing on the motive, purpose, and plan of defendant in sending the bomb in question.  p. 134.

6. Motive is not an essential element of the crime of murder, its existence being merely an evidentiary circumstance bearing with more or less weight, according to the circumstances, on the question of guilt.  p. 134.

7. Under sec. 4654, Stats., where defendant, without entering any plea in abatement or objecting in any respect to a preliminary examination, entered a plea of not guilty, he could not, after the trial had proceeded, show that the complaint in the justice's court was not regularly made.  p. 135.

8. Experts may give the reasons for their conclusions as to the similarity between specimens of handwriting.  p. 135.

ERROR to review a judgment of the circuit court for Wood county: BYRON B. PARK, Circuit Judge.  *Affirmed.*

Murder.  The plaintiff in error, hereinafter called the defendant, lived on a farm in the town of Auburndale, Wood county, Wisconsin, which lay within the Mill Creek drainage district.  He was born in Sweden, came to this country when he was fourteen years of age, was married, had three children, and at the time of the trial was forty-four years of age.  He was a skilled mechanic and had a large and varied experience, having been a soldier in the Boer war, and was a man possessed of unusual talents although he had had but little formal education.  One James A. Chapman was a resident of Wood county, chairman of the county board, and at the time of the incidents hereinafter referred to was a member of the Wood county drainage board, and as such had taken part in laying out the Mill Creek drainage.  He was a man sixty-five years of age, and his wife, Clementine, was sixty-three years of age.  They lived on a farm about seven

or eight miles from the defendant's farm, and with them lived their grandson, a young man about twenty-two or twenty-three years of age.   On the afternoon of December 27, 1922, the grandson brought the mail from the mail box in front of the Chapman home.   In it there were several Christmas cards, letters, and a package.   Mrs. Chapman picked up the package from the table and handed it to her husband.   It was a square package about fourteen inches long with a brown paper wrapper, tied with string.   It was tied lengthwise and then tied crossways with four strings. The center string was pasted down with some kind of paste or glue.   The package was addressed to J. A. Chapman, Marshfield, Wisconsin, Rural Route No. 1, with no return address.   Mrs. Chapman handed the package to her husband, who was sitting in a chair.   He placed it on his knee, took his knife and cut the string that went lengthwise.   As he did this his wife was leaning over watching the operation. He cut three of the cross strings, and as he cut the third cross string there was a terrific explosion.   Mr. Chapman's left hand, with the exception of his little finger, was blown off.   He also sustained other injuries to his leg and thigh. The pieces from the bomb struck Mrs. Chapman in the abdomen, and as a result of the injury sustained she died the following morning.   The grandson, who was sitting behind Mrs. Chapman, was uninjured.   There was emitted as a result of the explosion some thick black smoke.   Aid was at once summoned and Mrs. Chapman and her husband were removed to the hospital at Marshfield.   The *post mortem* upon the body of Mrs. Chapman showed that there were perforations of several of the vital organs sufficient to cause her death.   The wrapper on the bomb was somewhat torn and mutilated, but was preserved, identified, and offered in evidence as State's Exhibit A.   The word "Marshfield" was misspelled, being written "Marsfilld," the "h" and "e" being omitted.   Professor Stromberg of the University of Minnesota testified that this spelling was characteristic of

one familiar with the Swedish language as was also the pronunciation "Mars" for "Marsh." This fact led to the supposition that some person of Swedish antecedents had written the address. The only person known to have any existing enmity against Mr. Chapman was the defendant. He was also the only person of Swedish nationality in the district. It appears from the evidence that the bomb had been picked up on rural route No. 5 south of the city of Marshfield, from the box of one Thorbald Moen, about 2 o'clock in the afternoon of December 26, 1922, and taken to the city of Marshfield. For reasons which were sufficiently explained, the mail box in question had not been opened for several days before the afternoon of the 26th. Moen lived about a mile and a half west of the defendant's farm. From the pieces picked up about the Chapman home the bomb was reconstructed and was found to be made of a piece of white elm, about fourteen inches long and about an inch and a quarter square, with a hole bored through the center, in which was placed a wagon bolt inside of a spring, which could be compressed by pulling the bolt back. The contrivance was so arranged that when the bolt was pulled back and the spring compressed it could be held in place by a trigger, which trigger could be secured by tying down one end with a string. Around the bolt and inside of the elm piece was a round brass tube, in which the bolt moved backward and forward. At the end of the square elm piece was a short piece of gas pipe screwed onto the piece of elm and connected with another small collar made from a piece of gas pipe. At the end of the bolt was fastened a small firing pin, and the firing pin was arranged so that, when the bolt was released by cutting the string that held the trigger, the firing pin would strike the cap of the U. M. C. Remington twelve-gauge shell. All the paper part of the shell was cut off. In contact with the U. M. C. shell was a detonating cap which was buried in the T. N. T. which filled the gas pipe, so that when the U. M. C. cap was fired it exploded the

detonating cap and the T. N. T. Shortly after the explosion the defendant's premises were inspected and searched with his consent. Pieces of gas pipe, of brass tubing, and other materials were taken from his premises, including a bottle of ink from his home and sawdust and shavings from his work bench. There was found on the premises of the defendant a complete mechanical equipment for working in wood and iron, including a work bench, pipe wrench, monkey wrench, chisel, punches, planes, a thread cutter, drawing knife, hammer, blow-torch, files, hack-saw blades, emery wheel, and other tools, and there was found also a box containing T. N. T. and empty T. N. T. wrappers. There was also a lathe in the shop. T. N. T. detonating caps were found on the premises and No. 12 U. M. C. Remington shells, the same kind that were used in the bomb. A triangular trip or trigger was taken off the gasoline engine of the defendant on account of its resemblance to the trigger found on the bomb. There were also found springs and other miscellaneous articles, and an exploded shell which exactly corresponded with the shell found in the bomb was found on the work bench of the defendant.

After the defendant was arrested, he made, at the request of the officers, several samples of handwriting and printing. He wrote the word "Marshfield" five times and each time left out the "h" and "e." He, however, inserted two *l*'s instead of one. At a later time he made other samples of his handwriting. This was after the employment of counsel and after he had seen the original wrapper and "Marsh" was correctly spelled.

With these materials in hand counsel for the State set to work to establish the fact that the defendant was the manufacturer of the bomb and therefore guilty of killing Mrs. Chapman. The handwriting upon the package, together with the admittedly genuine writing of *John Magnuson*, was submitted to three experts—John F. Tyrrell of Milwaukee, Wisconsin, Albert S. Osborn of New York City.

author of "Questioned Documents," and Jay F. Wood of Chicago,—probably the three most eminent and reputable handwriting experts in the United States. Working separately they all positively identified the handwriting on the package as the handwriting of the person who wrote the admittedly genuine standards. In this respect their conclusions were undisputed except by the defendant and one W. W. Way of Milwaukee. A careful perusal of his testimony rather strengthens than disputes the conclusions reached by the three first named experts. His cross-examination left his testimony in such shape that it rather confirmed than contradicted the testimony of the other experts. His attempt to account for the resemblance between the writing on the wrapper and the admitted writing of *Magnuson* on the ground of "accidental coincidence" cast great doubt upon his conclusions. Under the microscope the writing upon the package showed that it was written with a fountain pen with a round point, similar to the pen of Ethel Magnuson, the daughter of the defendant. The ink used in writing the wrapper Exhibit A gave the same reaction to chemicals as the ink in the pen of Ethel Magnuson. The ink in the Magnuson house did not give the same chemical reaction, but it was discovered that Ethel's pen had been used by a schoolmate who used black ink, and this black ink combined with the ink which was found in the house gave the special reaction. An analysis of the glue used to fasten down the string disclosed that it was LePage's glue. *Magnuson* had shortly before this time used LePage's glue in an attempt to repair a fountain pen for his son. Professor Arthur Koehler, of the United States forest products laboratory at Madison, established the fact that the sawdust taken from the defendant's work bench was of white elm. This would not have been significant had not the defendant denied that he had ever worked on elm wood in his shop in his life. He admitted having worked on oak. Under the microscope it appeared that the sawdust came from hemlock, oak, and white elm. That part of the

wooden covering of the bomb which remained was white elm. The trigger on the bomb was compared with the trigger taken from the gas engine on the premises of the defendant. These triggers were analyzed by Professor David Fahlberg of the University of Wisconsin. It was established that no two pieces of steel or iron are identical in appearance unless they come from the same piece. When magnified and photo-micrographs are taken of the crystals and formation of the metal, the photo-micrographs differ very materially in two pieces of steel. The analysis showed that the trigger from the bomb had the identical crystals and formation of that obtained from the trip on the gasoline engine. The crystal grains of the metal were compared and the metals were etched and photo-micrographs taken after the etching. Different pieces of steel were taken at random and photo-micrographs were taken to show how the pieces differ. The surface of the two pieces appeared to be identical. The thickness was the same to one-half part of a thousandth of an inch. The angle of the cut of the two pieces was the same to within one tenth of a degree. Professor J. H. Mathews of the University of Wisconsin and Professor Fahlberg examined the two pieces of wrought iron which were found. They were found to be of the same size and to have the same photo-micrograph. It also appeared that wrought iron is made in batches of 100 pounds. It would be highly improbable that two pieces would have the same appearance unless they were out of the same batch. The two pieces had the same peculiar physical characteristics. They were from three-quarter-inch pipe and each had fourteen threads to the inch. Two other exhibits were found, Y and O. O came off the bomb, and Exhibit Y was found on defendant's premises in his workshop. Both pieces were threaded on the inside. This threading was not necessary for the construction of the bomb, hence the conclusion that they had been cut from a piece that the maker had on hand. They were also threaded on the outside. The photo-

micrographs disclosed the identity of these two pieces. Of this the experts were absolutely certain. The identity of the pieces was further established by the fact that they had the same diameter to a thousandth of an inch. The thread on the outside was fourteen per inch, which is a standard thread. The thread on the inside was eighteen to the inch, which is not a standard thread. The identity of the three pieces of metal found in the bomb and the three pieces of metal found on the defendant's bench is as conclusively established as it is possible to establish a physical fact.

It appears from the evidence that the defendant had made numerous threats in connection with the laying out and digging of the drainage ditch across his land. He was very bitter and hostile to the entire project. He had visited Mr. Chapman many times. When the dredge was within twenty rods of defendant's line it was blown up. The defendant had threatened to drive off the men working on the dredge with a gun; that they would never go over his land as long as he could shoot a gun. When his neighbors joined in a petition and employed an attorney he refused to unite with them, but admits that he said he would use his forty-four (meaning his forty-four caliber rifle). In connection with the blowing up of the dredge he made the statement that the head men had better look out or they would get their heads blown off. He charged that the work in connection with the drainage project was crooked and illegal. It appears without dispute that the dredge was in fact blown up. Upon the dredge were found the remains of a T. N. T. wrapper. The next day he explained that he was awakened in the night by the explosion. However, he told a Mr. Durst that he did not think the dredge was blown up, but that it was burnt up by spontaneous combustion from oil rags. There was some attempt to claim that the explosion was due to gasoline or kerosene, but the containers of these substances were full of holes, which disclosed that the explosion from that source took place after the first explosion.

There are many other circumstances of the same general character as those already set forth. The defense consisted of a general denial by the defendant of many of the material facts. There was a weak attempt to show the presence of strangers in the vicinity, but the stories told were of such an improbable and contradictory character as to make them worthless. The court submitted the case to the jury at about 4:30 in the afternoon. They did not immediately enter upon the consideration of the case, and about 8:40 on the same evening the attention of the court was called to the fact that no charge had been given relating to the blowing up of the dredge. The jury was then recalled and the following instruction given:

"Evidence has been received in this case tending to show, if you believe it credible, that the defendant blew up the dredge. Does such evidence convince you beyond a reasonable doubt that the defendant destroyed the dredge? If it does not, then the destruction of the dredge can have no bearing upon the question involved in this case, and you should disregard it.

"If it does convince you beyond a reasonable doubt that the defendant destroyed the dredge, then in considering it you are instructed the sole ground on which it is received is the theory that it may tend to show motive, intent, and system on the part of the defendant in the commission of the crime charged against him in the information in this case. It is for you to determine its value, and it is received for no other purpose except as above stated."

The jury retired, and the next morning about 10 o'clock, having the case under actual consideration a little over twelve hours, returned a verdict finding the defendant guilty of murder in the first degree. The defendant was sentenced, and he brings this writ of error for review to the circuit court.

For the plaintiff in error there was a brief by *Fawcett & Dutcher* of Milwaukee, and oral argument by *Frank L. Fawcett.*

For the defendant in error there was a brief by the *Attor-*

*ney General, J. E. Messerschmidt,* assistant attorney general, *Theo. W. Brazeau,* special assistant to district attorney, and *Marvin S. King,* district attorney of Wood county, and oral argument by *Mr. Brazeau.*

ROSENBERRY, J.  The sufficiency of the evidence to sustain the verdict in this case is not challenged.  We have, however, set out the evidence with greater particularity than would ordinarily be warranted under such circumstances because it discloses what may be done by a diligent prosecuting officer who has an intelligent comprehension of the things that are necessary to establish guilt in a case of this importance.[1]  The guilt of the defendant is as conclusively established as it is possible for it to be.  It is scarcely conceivable that any jury could find otherwise than did the jury in this case.  The assignments of error made must therefore be considered in the light of the whole record.

The first assignment of error is that "it was error to admit the testimony of the acts and conversation of *John Magnuson* under the conditions in which he was held from 11 o'clock in the evening until 8 o'clock the next morning." This assignment is supposed to refer to the day of the arrest of the defendant.  No admissions were offered or received in evidence.  There is no credible evidence that *Magnuson* was in any way coerced or that he was unduly or unreasonably restrained.  He was asked to and did write the exhibits which have heretofore been referred to.  It was done for the purpose of comparing his handwriting with the handwriting on the wrapper of the bomb.  He freely and frankly told the officers who had him in charge all about his former life and repeated these facts upon the stand voluntarily.  We are referred to no admissions, and this assignment of error has no basis in the record to support it.

---

[1] See Wisconsin State Bar Association Proceedings, June, 1924. Address, "Use of Scientific Methods in the Detection of Crime," by Prof. J. H. Mathews, University of Wisconsin.

The second assignment of error is that "the court erroneously admitted testimony regarding the blowing up of the dredge." This testimony was offered and received for the purpose of showing the connections of the defendant with the drainage project and the reason for his animosity toward J. A. Chapman. It is the general rule that evidence of a separate and independent crime is inadmissible to prove the guilt of a person on trial for a particular criminal offense. There are, however, many important exceptions to this rule.

In Jones on Evidence, p. 734, sec. 144, the rule is stated as follows:

"While it has been held in some courts that such evidence is irrelevant, yet by the weight of authority evidence of such other representations or transactions is received, when they show a common motive or intent and when the transactions are so. connected in point of time and so similar in their other relations that the same motive may reasonably be imputed to all. . . . Applying the same principle, the courts have often received evidence of other similar offenses in the trial of indictments for homicide or homicidal assaults, as tending to show a deliberate plan or to repel the inference of accident."

See, also, Wharton, Criminal Evidence (10th ed.) p. 59, § 31; *State v. Miller,* 47 Wis. 530, 3 N. W. 31; *Zoldoske v. State,* 82 Wis. 580, 52 N. W. 778; *McAllister v. State,* 112 Wis. 496, 88 N. W. 212; *Dietz v. State,* 149 Wis. 462, 136 N. W. 166.

The blowing up of the dredge, and the attempt to kill Mr. Chapman which resulted in the unintended death of his wife, are so connected in time and place and motive as to be parts of a plan formed by the defendant to carry out his purpose to obstruct the completion of the drainage project. In the statement of facts we have referred to the threats made by the defendant on numerous occasions. Within the rule established by this court the evidence objected to was clearly admissible.

The third assignment of error is that hearsay testimony was received over the objection of the defendant. Only a part of the testimony is set forth in brief of counsel. A careful examination of the record discloses no basis for the objection. Certain statements made by a witness were attacked by the defense for the reason that they had not been reported to Mr. Chapman and in an attempt to show in rebuttal that it had been reported by way of an irresponsive reply, and the witness testified: "I met Mr. Chapman in Marshfield and he told me *Magnuson* had been over there and he was quite riled up, and I said 'Jim, you want to keep your eye on that boy.' " The fact that *Magnuson* had been over was established by the testimony of the defendant himself, as was the fact that he was considerably irritated or riled up. The statement "Jim, you want to keep your eye on that boy," was probably not strictly admissible, but under the evidence in this case it was harmless.

The fourth assignment of error is that the court erroneously admitted the testimony of handwriting experts based on specimens of defendant's writing not voluntarily made. The evidence established most conclusively that specimens of handwriting were made by the defendant without any coercion, freely and voluntarily. This assignment of error is wholly without merit.

The fifth assignment of error is that the court erred in its instruction regarding the testimony of the defendant. The instruction was as follows:

"The defendant has testified on his own behalf. He is a competent witness and you should not discredit him merely because he is charged with crime. He is, however, deeply interested in the result of this trial, and you are entitled to take into consideration and consider the temptation which arises under such circumstances to testify to a state of facts favorable to himself. Other witnesses on the trial may by reason of their relation to the defendant be deemed to be interested in the result. You should take into consideration all such interests so far as they appear by the evidence. The

same test that you apply to determine the credibility of the defendant, you should apply to each and every other witness."

No authority is cited to sustain this assignment, probably for the reason that none could be. This instruction was taken practically verbatim from *Emery v. State,* 101 Wis. 627, 78 N. W. 145, where it was expressly approved.

The sixth assignment of error is that the court erroneously instructed the jury respecting the destruction of the dredge. The following is particularly criticised:

"Evidence has been received in this case tending to show, if you believe it credible, that the defendant blew up the dredge. Does such evidence convince you beyond a reasonable doubt that the defendant destroyed the dredge? If it does not, then the destruction of the dredge can have no bearing upon the question involved in this case, and you should disregard it."

This is said to be highly prejudicial. Bearing in mind what has been said with reference to the admissibility of testimony tending to show that the defendant destroyed the dredge, the instruction complained of seems to be favorable to the defendant rather than otherwise. Under it, before the jury may consider the evidence at all, they must be satisfied beyond a reasonable doubt that the defendant blew up the dredge. That the dredge was blown up appears without substantial dispute. If the threats and conduct of the defendant in connection with the entire drainage project, considered with his conduct thereafter, convinced the jury beyond a reasonable doubt that the defendant blew up the dredge, then under the rule they had a right to consider it as having bearing upon the motive, purpose, and plan of the defendant in sending the bomb in question. *Zoldoske v. State,* 82 Wis. 580, 52 N. W. 778.

The admission of evidence respecting the destruction of the dredge was for the purpose of establishing motive or a system adopted by the defendant. Motive is not an essential

element of the crime of murder. Its existence is merely an evidentiary circumstance bearing with more or less weight, according to the circumstances, on the question of guilt. In some cases it may have very great probative force. In others its value may be negligible.

Under the circumstances of this case there could be no doubt of the fact that the person who sent the bomb was guilty of the crime of murder, the death of Mrs. Chapman having resulted therefrom. Where the circumstances of the killing are so conclusively established as they are in this case, motive becomes immaterial. *Hedger v. State,* 144 Wis. 279, 128 N. W. 80; *Spick v. State,* 140 Wis. 104, 121 N. W. 664.

The last assignment of error is that the court erroneously denied counsel the privilege of ascertaining whether or not the complaint was signed in what is known as "due process of law" and issued by a court of competent jurisdiction. The defendant was represented at the trial by able counsel. Without having entered any plea in abatement or made any objection in respect to the preliminary examination, the defendant entered a plea of not guilty. After the trial had proceeded, the defendant attempted to show that the complaint in justice's court was not regularly made. Sec. 4654, Stats. 1923, provides:

"No failure or omission of such preliminary examination shall in any case invalidate any information in any court unless the defendant shall take advantage of such failure or omission before pleading to the merits by a plea in abatement."

This assignment of error raises no question for review.

It is also contended by counsel that the court erred in permitting the handwriting experts to give the reasons for their conclusions. This objection seems to us trivial and without merit. A rule of law that would permit an expert to take the stand and state his conclusion without doing any more would place the least qualified, most prejudiced expert

on the same level as the best qualified and most.conscientious expert.  Particularly is this true in regard to the testimony given by a handwriting expert which rests very largely for its convincing power upon the similarities and peculiarities which enable the expert to arrive at his conclusion.  *McKay v. Lasher*, 121 N. Y. 477, 24 N. E. 711; *People v. Faber*, 199 N. Y. 256, 92 N. E. 674.

We have given the objections raised by the defendant here more consideration than we would deem fitting were this not a capital case.  A careful consideration of the record leaves us with no doubt as to the guilt of the defendant.  He was ably represented at the trial and his cause has been presented with ability in this court.  Such criticisms as may have been made in discussing the assignments of error are inherent in this case for the reason that the defendant had a full, fair, and complete trial, the trial judge having accorded him every privilege to which he was entitled.  While the trial was long and difficult, all of the matters urged by the defendant were considered with care and patience in keeping with the gravity of the situation.  We find no error, and the judgment must be affirmed.

*By the Court.*—It is so ordered.