FENELON, Plaintiff in error, vs. THE STATE, Defendant in error.

*January 14—April 3, 1928.*

*Forgery: Subornation of perjury: Presenting false will for probate: Evidence as to motive: Effort to have witness give false testimony in pending case: Admissibility: Disputed handwriting: Comparison with photographic copies and not originals: Harmless error: Newspaper comments criticising defense.*

1. In a prosecution as an accessory to the crime of forgery and as a suborner of perjury to establish a will, evidence as to the existence or lack of existence of a motive for the procurement of the alleged forgery is *held* to present an issue for the jury.   p. 420.

2. In a prosecution on an information containing two counts, one charging the defendant as an accessory to the crime of forgery and the other charging him as a suborner of perjury to establish a will, the evidence (detailed in the opinion and statement of facts) is *held* sufficient to sustain a conviction. p. 423.

3. Testimony as to an attempt to suborn a witness to testify to facts supporting the defense is admissible for the purpose of establishing a general scheme tending to prove the forgery and subornation of perjury, though the attempt constituted a separate and distinct offense.   p. 425.

4. Testimony by a handwriting expert as to the genuineness of disputed handwriting, based on comparisons between photographic copies of the signature of the will and signatures in the handwriting of deceased, is admissible under sec. 327.26,

Stats., where the will had been either destroyed or lost sub-
sequent to making the photographic copies.  p. 429.

5. The fact that articles were published in a newspaper during the
   course of the prosecution which tended to create an unfavor-
   able atmosphere toward the defendant does not require a new
   trial in view of the action of the court in citing those in
   charge of the offending newspaper and in issuing an injunc-
   tional order, particularly since the case was not a close one.
   p. 432.

*On rehearing:*

6. A motion for a new trial on the ground of newly-discovered
   evidence should be made in the circuit court where the case
   was tried, and not in the supreme court.  p. 432.

ERROR to review a judgment of the circuit court for Fond
du Lac county: OSCAR M. FRITZ, Judge. *Modified and
affirmed.*

The plaintiff in error will hereinafter be referred to as
the defendant.  The defendant in the information filed on
the 23d day of May, 1927, was charged in two counts, re-
spectively, as an accessory to the crime of forgery, and as
a suborner of perjury to establish a will.  The complaint in
the original action is dated December 22, 1926.  The jury
found the defendant guilty on both of the counts of the in-
formation, and from the judgment and sentence of the court
pursuant to the verdict of the jury the defendant has taken
this appeal.

Mike Fenelon died on the 2d day of July, 1925, a resident
of Fond du Lac, Wisconsin.  He left surviving him two
brothers, the defendant *E. C. Fenelon* and William Fenelon.
On the 19th day of May, 1925, the deceased executed a last
will and testament (hereinafter referred to as the Husting
will), in and by which several legacies were bequeathed to
friends of the testator's deceased mother; the sum of $1,000
to Attorney Husting, of Fond du Lac, and property in the
sum of about $10,000 to a son of the defendant when he
arrives at the age of thirty years, and in the meantime the
amount so bequeathed is to be held by said Husting for the

benefit of such child as his guardian.   The genuineness of the Husting will is conceded.

On June 1, 1925, the deceased, being in ill health, conferred with Dr. Twohig, who recommended an immediate operation.   It is the claim of the defendant that on June 2, 1925, the deceased, realizing the seriousness of his ailment, concluded to execute a new will; that he called at the office of Dillett, an attorney at Waupun, where the alleged will was drafted, and executed on June 2, 1925, in presence of said Dillett and one George Fenelon, a second cousin of the deceased, and the two last named acted as witnesses to the will.

On July 6, 1925, being two days after the burial of the deceased, the defendant made application to the county court in probate of Fond du Lac county for the appointment of an administrator of the estate of the deceased, Duffy & McGalloway of Fond du Lac acting as attorneys.   On or about the 18th day of July the defendant received notice from his attorneys that the Husting will had been filed, and application was immediately made for the probate of such will. There is also evidence in the case indicative on the part of the defendant of considerable chagrin and disappointment with respect to the contents of the Husting will.

On the 25th day of July, 1925, Attorney Dillett deposited the alleged will of June 2d with the county court, and notice thereof was received by Duffy & McGalloway, who promptly conveyed notice thereof to the defendant, who immediately proceeded, with the aid of Attorney Dillett, to institute proceedings for the admission of such will to probate.   In the alleged will of June 2d the defendant is named executor, and the property is distributed among the two brothers of the deceased.   Objections were filed to the probate of the alleged will of June 2d upon the ground that the same is a forgery.   The matter of the hearing on the application to probate the alleged will of June 2d was taken up in April, 1926, and at such hearing the witnesses to such alleged

will appeared and testified in support of the execution and genuineness of the same.

Subsequent thereto, and some time in November of the same year, George Fenelon made a confession to the district attorney of the county in and by which he repudiated all of the material testimony theretofore given by him in the matter of the probate of the alleged will of June 2d, denominated the will a forgery, and stated that he and Dillett acted as accessories to the crime of forging the will and were guilty of perjury on the hearing in the matter of the application to admit the alleged will to probate, and that they were suborned by the defendant. Upon the basis of such confession and other evidence the criminal proceedings herein against the defendant were instituted and prosecuted.

The foregoing constitutes a mere outline or skeleton of the material facts, and additional facts will be referred to in the opinion which follows.

*J. E. O'Brien* of Fond du Lac and *Walter D. Corrigan, Sr.,* of Milwaukee, for the plaintiff in error.

For the defendant in error there was a brief by *L. E. Gooding,* district attorney, *L. J. Fellenz* of Fond du Lac, special prosecutor, the *Attorney General,* and *J. E. Messerschmidt,* assistant attorney general; and the cause was argued orally by *Mr. Gooding, Mr. Fellenz,* and *Mr. Messerschmidt.*

The following opinion was filed February 7, 1928:

DOERFLER, J. The defendant was convicted at the end of a long and protracted trial, and the able counsel engaged in the legal combat exhausted every reasonable means available to support their respective contentions. Great dignity and ability were displayed by the learned trial judge while presiding over the trial. We are convinced that the defendant had a fair and thorough trial and that no prejudicial error is manifest from the record.

It is urged by counsel for the defense that no motive

existed on the part of the defendant for the procurement of this alleged forgery; that the provisions of the will of May 19th are more favorable to the defendant than are those contained in the alleged will of June 2d; that while no express provision for the benefit of the defendant is contained in the will of May 19th, the bulk of the property of the deceased is left to the defendant's child; that the deceased, when informed of the seriousness of his condition on June 1st by his physician, evidently regretted that he had practically disinherited his two brothers and had disposed of a large portion of his estate to others than those connected with him by ties of blood, and that, facing an uncertainty with respect to his ability to survive the operation, all prior resentments were forgotten and he therefore concluded to dispose of his property according to the dictates of his conscience, with a view of doing natural justice; that the alleged will itself is not subject to criticism of being unnatural, because it follows substantially along the line of a distribution under the statutes of intestacy.

The reasons thus advanced would be persuasive to a large degree if we considered the defendant as an individual ungoverned by passion, prejudice, and resentment. Every act of man induced by passion and prejudice and based upon resentment results in a detriment to the actor, but nevertheless may constitute a most powerful motive. The evidence reveals a violent reaction to the provisions of the Husting will, and a resentment largely based upon the provision under which Husting was to receive a legacy of $1,000 and was appointed the guardian of the minor child of the defendant. Expressions of the defendant concerning the Husting will were violent and vituperative. The determination of the existence or lack of existence of a motive, under the facts and circumstances of this case, therefore properly presents an issue for the jury to determine, and we are of the opinion that an adequate motive has been shown.

It is next argued that the evidence is conclusive that Mike Fenelon was at Waupun on or about the 2d day of June, 1925, and that he executed a will at that time; that his presence at Waupun was established not only by the testimony of Dillett and George Fenelon, but also by that of Geschel and two other witnesses.  But here it must be remembered that George Fenelon and Geschel completely repudiated their testimony given upon the hearing of the application for the probate of the alleged will of June 2d; that they expressly confessed the falsity of their testimony given on such will contest, in the trial of this action, both witnesses placing the responsibility for their false testimony upon the defendant herein.  Furthermore, there is strong testimony on the part of two witnesses for the State to the effect that on June 2, 1925, the deceased on the afternoon of that day was in Fond du Lac and not at Waupun.  There was ample testimony, therefore, to support the conclusion of the jury that the deceased was not at Waupun at the time of the alleged execution of the June 2d will.

According to the testimony of George Fenelon he was overtaken by remorse and fear not long after the will of June 2d had been forged.  As an excuse for the confession which he made in the fall of 1926, he testified upon the trial that his health had gradually become undermined; that he had become nervous and sleepless, and that he suffered pangs of conscience for the ill deed in which he participated; that he had frequent interviews with the defendant, whom he informed of his regrets and to whom he expressed the ardent wish that some scheme might be devised which would relieve him of his troubles and finally dispose permanently of the June 2d will; that these statements did not appear to have considerable effect upon the defendant, who insisted upon carrying out his designs and plans, and that the defendant reproved him, telling him that he was suffering from softening of the brain.  That in the spring of 1926 he re-

peatedly called upon the defendant at his home in Brandon, where he discussed the situation, and where, as he claims, he pleaded for something which would result in a final disposition of the probate proceedings on the will of June 2d, and that he was advised by the defendant to procure from the register of probate the files in his office in the following estates : the Larrabee estate, the Margaret Fenelon estate, and the Michael Fenelon estate, upon the pretext that he had some interest in such estates, and that upon obtaining possession of these files to destroy the June 2d will. That he was advised by the defendant that the destruction of such will would result in a disallowance of the same to probate, and that no further difficulties would be met with thereafter. That thereupon George, pursuant to the advice and instructions of the defendant, called at the office of the register of probate, demanded the various estate packages and received the same, and that he then sat down at a table, where he pretended to peruse these files, and that he tore the alleged will of Mike Fenelon, of June 2d, in two pieces and deposited them in the waste-paper basket standing on the floor near the register's desk. That soon after the alleged destruction of the will the register in probate became aware that it could not be found, and he then made a search of places in his office where he had reason to believe it might have been placed by mistake; that after an extensive search he concluded that the instrument was either lost or destroyed. At the time of the trial of the criminal action the whereabouts of the alleged will of June 2d had not been discovered.

The learned counsel for the defendant place little faith in George's claim that the will was destroyed in the manner in which he testified. They argue that the testimony of George to the effect that he tore the will in two parts and that he deposited the same in the waste basket is entirely incredible. It may be admitted that the disposition made of the will, if true, did not evince an exercise of good judg-

ment or wisdom and that the method pursued was liable to lead to a discovery of the perpetrator of the unlawful act; but one thing is definite and certain, and that is that the will has disappeared, and that there is strong corroboration that it was destroyed at or about the time fixed in George's testimony. The register of probate, when called upon the stand on the trial of this action, testified that he recalled George's presence in the probate office and that the files above stated were handed to him, and that he became aware that the will was missing in September, 1926. The inability of the register to locate the will, together with the admission of George that he was present at the probate office at the time testified to by him, and the recollection of the register that George was actually in the office between the time of the last hearing in the probate court in April and the following September, and that he, the register, had delivered to George the three files in question, constitute evidence possessing great probative force. Here it must also be noted that if George's testimony be true, he was not in a mental condition, as a result of nervousness and sleeplessness, to enable him to formulate logical and prudent methods. We therefore conclude that there was ample evidence to warrant the jury in arriving at the conclusion that the alleged will of June 2d was destroyed by George in the manner testified to by him, and that this destruction was induced by the defendant.

The defendant testified that shortly before the 11th day of November, 1926, George made a number of visits to his home in Brandon; that on one occasion while his wife was present, George came to the rear of the defendant's house and stated that he needed money, and requested that $3,000 be given him; that the defendant answered, "I haven't got $3,000;" that George replied, "You have property, raise it;" that the defendant then said, "Why should I raise money for you?" to which George replied, "If you don't I will kill your claim in the will case;" that the defendant then said,

"I don't see how you could kill my claim in the will case," to which George replied, "I'll show you;" and that the defendant then said, "Did you come here to extort money from me? You must be crazy." That the conversation then ended abruptly and George left the defendant's home. This conversation is denied *in toto* by George, although he admits that at or about the time of this alleged conversation he paid a visit to the defendant's home, during which time some plan or scheme was discussed to dispose of the matter of the alleged forged will. It is a remarkable fact that while George testified that Dillett was promised $1,000, and Geschel had a reward of $100 held out to him, nothing was said with respect to George's compensation. George, however, was a blood relative of the defendant.

If the testimony of George is to be believed, the defendant relied more upon his aid and assistance than upon any other person connected with the transaction pertaining to the alleged forged will. George claims that he was the one designated by the defendant to secure the testimony of Geschel. It was with George that the defendant conferred from time to time to devise and execute plans to the end that the alleged will of June 2d might be admitted to probate. George's confession was against his interests, while the alleged blackmail scheme testified to by the defendant was in the defendant's interest. A person who is so depraved as to be an accessory to the forging of a will is liable also to stoop to blackmail or the commission of any other criminal offense. Conceding, for the sake of argument, that blackmail was actually resorted to as testified to by the defendant, nevertheless George's testimony on material facts connected with the forgery cannot be ignored, especially where it is corroborated by the testimony of credible witnesses. It was for the jury, however, to determine whether the alleged blackmail was founded upon truth or not, and it is our opinion that under all the testimony and the facts and circum-

stances of the case George's version has the ring of truth in it, and that the jury was of a like opinion.

In the brief of counsel for the defense both George Fenelon and Mr. Geschel are denominated as perjurers. The witness Geschel, upon the trial of the criminal case, repudiated his testimony given in the county court. It is true that both Geschel and George committed perjury in one court or the other. Their testimony in both courts cannot be true, inasmuch as the testimony on the criminal trial expressly contradicts that given by them in the county court. But when Geschel testified in the county court he was actuated to commit a crime by the promise of a reward. No reward whatever, as far as the testimony discloses, was promised him on account of his testimony in the criminal case. By admitting the falsity of his testimony in the county court he subjected himself to criminal prosecution for a felony. In this situation the jury was fully warranted in believing that his testimony on the criminal trial was truthful and that his testimony in the county court was false. The testimony of Geschel is strongly persuasive of a general scheme designed by the defendant to establish the will of June 2d by perjured testimony. This testimony on the trial had great probative force, and unquestionably weighed strongly in the eyes of the jurors against the defendant.

After the alleged will of June 2d was filed it was claimed by the contestants that the same was forged. Photographic copies of this will were thereafter made by one Tyrrell, a handwriting expert of great note, and by a photographer at his request. From evidence upon the trial it appears that the photographic reproductions were strictly accurate and correct, and that they represented the best afforded by the photographic art; that the cameras were the most modern and reliable, and that the manner in which the pictures were taken was conducive of an exact photographic reproduction of the original. The State relied upon Tyrrell's testimony.

He described in detail the methods pursued in securing the photographic reproductions. After an extensive examination made not only of the original at a time when that document was available, but also of the photographic reproductions and the enlargements produced by the camera, he expressed an unqualified opinion as an expert that the signature purporting to be that of the testator on the will of June 2d constituted a forgery. In the course of his testimony he followed the various strokes of the pen, and compared them with the conceded exhibited handwritings of the deceased, during a time when all of these specimens and reproductions were before the jury, and while he did not have in his possession the original purported will of June 2d, he did have the best secondary evidence that was available. The defendant produced two handwriting experts, the one a teller of a bank familiar with the deceased's signature, and the other being the head of a commercial college and who had given over a quarter of a century of his time and effort in the teaching and study of handwriting, and both expressed their opinions as experts that the signature upon the alleged will of June 2d was the genuine signature of the testator. The bank teller testified that, assuming that a check purporting to be the check of the deceased, with a signature like that appearing upon the alleged will of June 2d, were presented to him, he would have no hesitancy in honoring the check by paying the amount called for therein.

Assuming that these photographic reproductions were legally admissible in evidence, and that comparisons between them and conceded specimens of handwriting of the deceased could be made and testified to before the jury, the question of the genuineness or falsity of the writing upon the disputed document constituted an issue within the province of the jury to decide. It is rather the exception than the rule that experts in any field are found to agree in their testimony, but when these experts have testified, and upon their

direct and cross-examinations have fully explained the reasons for their opinion, the issue becomes cleared of many of its perplexities.

Counsel for the defendant in their brief have repeatedly and earnestly attempted to impress upon us that a defendant in a criminal action is entitled to the conscientious judgment of each member of the court. The members of this court in their effort to review the record in this case have carefully complied with this request, as is their custom particularly in criminal cases. We do not, however, consider this a close case. The salient points involved are so pronounced that it did not become a difficult task to arrive at a logical conclusion and to render a decision in accordance with the truth of the matter. In reading the record of this case, conviction fastens itself upon the mind of the reader that the verdict of the jury was well warranted and correct, and unless prejudicial error was committed on matters of law the judgment should be affirmed. The conclusion which we have arrived at is based upon the principal facts and circumstances referred to in this opinion. There are, however, a great number of minor incidents to which reference might be made if we deemed it necessary, but no useful purpose could be served thereby.

As heretofore stated, there is evidence in the case which tends to prove that the witness Geschel was suborned by the defendant to falsely testify to facts and circumstances supporting the defense herein. It is contended by defendant's counsel that the State could not legally introduce testimony to show that the witness Geschel was suborned, upon the hearing in the matter of the application to probate the alleged will of the deceased; that the effect of such attempt at subornation would constitute a separate and distinct offense, and that the testimony was improperly admitted. It is argued by counsel that such testimony is admissible only to establish identity or intent. That it is admissible for these purposes

cannot be disputed, and the authorities appear to be uniform upon the subject. In the instant case, however, the object of the State in introducing the testimony so objected to was for the purpose of establishing a general scheme tending to prove the forgery and the subornation of perjury. That such testimony is admissible is laid down not only by the leading text and reference books, but by the great weight of judicial authority. 30 Cyc. "Perjury," 1448; 16 Corp. Jur. "Criminal Law," 608; 8 Ruling Case Law, "Criminal Law," 203; *Magnuson v. State,* 187 Wis. 122, 203 N. W. 749; *People v. Van Tassel,* 156 N. Y. 561, 51 N. E. 274; *People v. Toledo,* 150 App. Div. 403, 135 N. Y. Supp. 49.

The overruling of defendant's plea in abatement to the first and second counts of the information is also assigned as error. That this plea in abatement was properly overruled appears from the case of *Thies v. State,* 178 Wis. 98, 189 N. W. 539.

Error is assigned by defendant's counsel because the court permitted Tyrrell, the handwriting expert of the State, to testify as to the genuineness of the disputed handwriting of Michael Fenelon, based upon comparisons between photographic copies of the signature of the will of June 2d and signatures conceded to be in his handwriting; also because these comparisons were in part based upon enlarged photographic reproductions of the signature on the will and conceded handwriting. Reference is made to the common law of this state as it existed prior to the enactment of ch. 226 of the Laws of 1881 and sec. 327.26 of the Statutes for the year 1925. Under the common law as it existed in this state prior to 1881, no comparison of signatures could be made between disputed handwritings and genuine handwritings on other documents, unless such other genuine handwritings were in evidence for purposes other than for comparison. *Pierce v. Northey,* 14 Wis. 10; *State v. Miller,* 47 Wis. 530, 3 N. W. 31; *Hazleton v. Union Bank,* 32 Wis.

34. In 1881 the common-law rule was changed by statute, and this statute was amended as will appear by sec. 327.26. The present statute reads as follows:

*"Comparison of writing.* Comparison of a disputed handwriting with any writing proved to the satisfaction of the court to be the genuine handwriting of any person claimed on the trial to have made or executed the disputed instrument or writing shall be permitted to be made by witnesses, and such writings and evidence respecting them may be submitted to the court or jury."

It is conceded that under the statute of 1881 and the amended statute as it now appears, experts may testify as to the genuineness of a handwriting by comparing the disputed handwriting itself with the conceded genuine handwriting in evidence. In the instant case, however, the will in question, containing the disputed signature of the deceased, could not be produced upon the trial. There is strong evidence that it had been purloined from the records of the county court and destroyed by George Fenelon, at the instigation of the defendant. The comparisons, therefore, were made between photographic copies and the conceded genuine handwritings of the deceased. In the early cases upon the subject involved, courts have adhered to the common-law rule. From time to time, however, the courts have adopted a more liberal rule upon the subject. Osborn in his work on Questioned Documents, on page 324, states:

"Photographs are now rarely excluded, although always objected to, and in some jurisdictions it is now almost, if not quite, reversible error to exclude them. The tendency of all courts of all states is towards that procedure which assists in showing the facts. In at least ninety-nine cases out of one hundred photographs are now admitted, and the most enlightened and progressive courts will hardly listen to objections to them."

The cases cited upon this subject are cited and digested in notes to 31 A. L. R. 1432 and subsequent pages; and it

becomes evident from a reading of these cases that the trend of modern decisions is in accordance with the tendency referred to by Osborn. This court in the case of *Baxter v. C. & N. W. R. Co.* 104 Wis. 307, 80 N. W. 644, expressed the opinion (*obiter*) that photographs were admissible to detect forgeries and to prove documents in cases where originals could not be readily produced. It also appears from many of the decisions referred to in A. L. R., *supra,* that in the earlier decisions the holding of the courts is based largely upon the unreliableness of the products of the photographic art at that time, and in a number of cases it was held that evidence was lacking to establish a correct reproduction of the original by the photographic process, or because it was not established that the photographer had or exercised the necessary skill in producing the photograph. But photography has progressed with the progress of the age. The instrumentalities used in photography at the present time are capable of almost perfect reproductions; in fact, reproductions from which comparisons can as safely be made as with the originals themselves.

The writer has had occasion within the last six months to witness the original portrait of Mona Lisa. There has also been submitted to him a photographic copy of that picture. A comparison of the photograph with the original portrait discloses a startling likeness of all of the characteristics of the portrait. Even the subtle smile in the original portrait appears in the reproduction. Da Vinci is known as one of the greatest scientists and painters of all ages. The portrait itself constitutes not merely a mechanical reproduction, but discloses intellectual and highly spiritual qualities of the subject in a manner as conceived by the artist, and these higher qualities were pronouncedly recognizable upon the photograph.

The handwriting of a person is characteristic of the person himself. It bespeaks traits of character, and a real handwriting expert does not merely rely upon the physical strokes,

but upon the character traits of the individual producing them, and these character traits as a rule are in evidence to the intelligent handwriting expert when viewing the photographic reproduction, largely to the same extent as in examining originals. After all, the statute modifying the common-law rule was expressly enacted in the interests of the administration of justice, and the rest of the statutes on the subject of comparison of handwritings, while differing to some extent in their wording, are designed to effect and to promote the same purpose. So it has also been held, as will appear from examining the notes referred to in A. L. R., *supra*, that photographic enlargements of handwritings may be made, in order to more clearly demonstrate the opinions of the experts. In the instant case the comparisons were made by all of the experts in the presence of the jury, and the members thereof were then in a position where they could decide from the testimony and from the exhibits themselves where the truth lay. It is true that the statute, sec. 327.26, when given a literal construction, does not specifically include photographic reproductions; but where the disputed handwriting has been either destroyed or cannot be found, it must be held, in order to effect substantial justice and to make the provision effective, that a reproduction like the one here in question may be used for the purposes of comparison.

Error is also assigned because of articles appearing in a newspaper published at Fond du Lac, Wisconsin, which were derogatory of the defendant and of his counsel. The court in the course of the trial found it necessary to cite those in charge of the offending newspaper before the court, and, upon a hearing, issued its injunction to those in charge of the paper. It is argued that the articles appearing in the paper created an unfavorable atmosphere toward the defendant, and that in all reasonable probability this offensive atmosphere permeated the jury. No excuse whatever can be offered in mitigation of the conduct of the officer or officers

of the paper who were guilty thereof. The constitutional rights of a free press are not intended to protect conduct like this,—conduct that has a tendency to pervert justice. Such conduct has never been approved by any judicial tribunal that we are aware of; on the contrary, it has been frequently condemned. It is not customary to confine a jury during a trial in such a manner as to divorce the members thereof from complete contact with the public, although it is within the power of a court so to do, and occasionally it is practiced. It seems that when the offensive article complained of was brought to the attention of the court, the learned trial judge took prompt action with respect to the same, and apparently the injunctional order issued was not violated. The presiding judge was in close contact with the situation from the very beginning of the trial, and in his opinion no ulterior influences evidently operated to cause the jury to deviate from the conscientious discharge of its duty.

We have heretofore expressed our opinion that the instant case is not a close one. If we thought otherwise, we might possibly come to a different conclusion upon this subject. Under the circumstances, however, we are of the opinion that a new trial should not be granted, but that the judgment and sentence of the lower court should be affirmed. We discover no prejudicial error in the case.

*By the Court.*—The judgment and sentence of the lower court are affirmed, and the cause is remanded with directions for further proceedings according to law.

The following opinion was filed April 3, 1928:

PER CURIAM. The defendant's motion herein for a rehearing is hereby denied.

The defendant also made a motion in this court for a new trial on newly-discovered evidence and filed and submitted affidavits in support of such motion. Such motion should be made in the circuit court where the case was tried.

In the motion for a new trial as aforesaid, we express no opinion whatsoever as to the merits.

The mandate, therefore, is modified so as to affirm the judgment, without prejudice to the right of the defendant to make his motion for a new trial on newly-discovered evidence in the lower court and have the same determined by such court.